UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
MICHAEL SMITH,                        )
                                      )
                    Plaintiff,        )
                                      )
v.                                    )        Civil Action No.
                                      )        1:13-cv-11430-PBS
ZIPCAR, INC.,                         )
                                      )
                    Defendant.        )
                                      )
_____)

SARIS, C.J.

**MEMORANDUM AND ORDER**

AUGUST 27, 2015

**I.    INTRODUCTION**

    This case stems from Plaintiff Michael Smith's 47-day

employment at Zipcar, the Boston-based car sharing company.

While Plaintiff was negotiating his executive compensation

package, which included stock options, Zipcar was contemplating

a possible merger with Avis Budget Group (Avis). When the merger

later went through, the stock options became worthless. After

his employment terminated, Plaintiff brought this action

alleging, among other things, that Zipcar engaged in fraud and

negligent misrepresentation by failing to disclose the merger

talks, and that Zipcar breached his employment contract by

failing to award him appropriate severance.

1

Defendant moved for summary judgment on all claims[1] (Dkt. No. 94). After hearing (Dkt. No. 124), Defendant's motion for summary judgment is **ALLOWED IN PART** and **DENIED IN PART**.

## II.   FACTUAL BACKGROUND

The facts are construed in the light most favorable to Plaintiff.

### A) Employment Negotiations

In September 2012, Zipcar set out to find a new "Executive Vice President, Technology." It retained an executive search firm, which recruited Smith. Then employed by Disney, Smith had previously worked for such blue-chip technology companies as Microsoft and Google. Over the course of fall 2012, Plaintiff met with Zipcar's then-CEO Scott Griffith and other senior executives. Impressed with Smith's qualifications, Zipcar made him an employment offer on November 15, 2012. This initial offer, however, was not to Smith's liking. In negotiations with the company's Human Resources Director, he sought enhanced stock options and a "Chief Technology Officer" (CTO) title. A new

---

[1] The Court previously allowed Defendant's motion to dismiss Plaintiff's Mass. Gen. Laws ch. 93A claim (Dkt. No. 52). Six claims remain: fraud (Count I); deceit/misrepresentation (Count II); breach of contract – failure to award 12 months' severance (Count III); breach of contract – failure to award options (Count IV); breach of the covenant of good faith and fair dealing (Count V); and negligent misrepresentation (Count VI).

offer was made on November 27; this too was rejected, and the negotiations pressed on.

On December 11, Zipcar sweetened its offer, and Smith accepted. The final compensation package featured a grant of 105,000 options, to vest over a four-year period. The package also included an annual salary of $290,000; an annual bonus equal to fifty percent of salary; a $25,000 relocation stipend; and, eligibility for additional stock options at Zipcar's discretion.

Under the Employment Agreement, Smith was an at-will employee. His contract provided for severance payments under two scenarios. If Smith resigned for "Good Reason" or was fired without cause <u>before</u> a "Change of Control," he would receive 6 months' salary, or $145,000. If, however, he resigned for Good Reason or was terminated without cause <u>after</u> a Change of Control, he would receive a year's salary, plus his targeted bonus, amounting to 1.5 years of pay, or $435,000. "Change of Control" was defined, in relevant part, as "the sale of all or substantially all of the capital stock." Exh. 14. Good Reason was defined, in relevant part, as "a material adverse change in your office, duties, salary, benefits or responsibilities made without your prior written consent." <u>Id.</u>  Under the contract, Smith was required to "set forth in specific detail the facts supporting" his reasons for separating. <u>Id.</u> If Zipcar adequately

3

"cured" those issues within 30 days, then Smith would be deemed to have resigned without Good Reason.

**B) The Merger**

Unbeknownst to Plaintiff, at the time he accepted the CTO job, Zipcar was in discussions with several different companies about financing options. Some of these corporate suitors simply wanted to make an equity investment in Zipcar; others wanted to buy the company outright. On November 17, two days after Plaintiff was first offered employment, Avis sent a letter to Zipcar expressing its interest in acquiring the company. At the same time that Plaintiff was negotiating his compensation package, Zipcar's lawyers and investment bankers were performing due diligence on Avis,[2] as well as nine other companies: two executed confidentiality agreements, and seven others showed informal interest. On December 31, 2011, twenty days after Smith's employment agreement was signed, Zipcar and Avis signed a merger agreement.

The following morning, on New Year's Day, Zipcar CEO Scott Griffith reached out to Plaintiff to inform him of the deal. Plaintiff was surprised, but reaffirmed his enthusiasm for the CTO opportunity and his intent to commence employment on January 21. Plaintiff began work as planned. Concurrently, he engaged in

---

[2] Avis commenced its due diligence on Zipcar on December 6, 2012.

4

discussions with Corbis, a Seattle-based technology company, about employment opportunities there.

When Plaintiff asked Griffith how the potential deal would affect his stock options, Griffith assured him that Avis would craft an alternative, comparable long-term incentive package ("LTIP"). To further assuage Smith's concerns, Zipcar offered to amend his employment contract to enhance the post-Change in Control severance to 24 months' salary. Counterproposals were exchanged in mid-February but an agreement was not reached. Frustrated that details of the alternative package had yet to materialize, and apparently unsatisfied with the enhanced severance offer, on March 5, 2013, Plaintiff gave notice of his intent to terminate his employment for Good Reason. Under the terms of his Employment Agreement, this triggered the 30-day cure period. In an e-mail to Griffith, Plaintiff avowed a desire to continue working at Zipcar during the cure period and a hope that the LTIP issue would be resolved. He wrote:

> I have every intention of staying engaged for the foreseeable future and I am open to a period of discussion (we should discuss that would take, but <u>I'd expect at least 30 days</u>) around a contract that would work.

Exh. 36 (emphasis added). Zipcar, however, terminated Plaintiff's employment on March 8, 2013. Plaintiff responded four days later by filing this lawsuit. In April 2013, Smith

commenced employment at Corbis, though he separated from the company six months later.

After the filing of the lawsuit, but before the cure period was set to end, the Zipcar-Avis deal closed on March 14, 2013. Zipcar is now a wholly-owned subsidiary of Avis.

## C) <u>LEGAL STANDARD</u>

Summary judgment is appropriate when there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence supporting the non-moving party's case." <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657, 660 (1st Cir. 2000) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). The burden then shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Quinones v. Houser Buick</u>, 477 F.3d 284, 289 (1st Cir. 2006). A genuine dispute exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004).

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. Sands, 212 F.3d at 661. The Court is required to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (quotation marks omitted). A party cannot avoid summary judgment by merely relying on "conclusory allegations, improbable references, and unsupported speculation." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (quotation marks omitted); see also Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (refusing to "indulge rank speculation or unsupportable hyperbole" at the summary judgment phase).

### D) DISCUSSION

## A) Fraud and Deceit/Misrepresentation (Counts I and II)

The thrust of Plaintiff's fraud and misrepresentation claims is that Zipcar engaged in fraud[3] when it failed to

---

[3] Defendant asserts that Plaintiff has failed to satisfy the Rule 9(b) heightened pleading standard for fraud. See Fed. R. Civ. P. 9(b); Pearce v. Duchesneau Grp., Inc., 392 F. Supp. 2d 63, 72 (D. Mass. 2005) (observing that Rule 9(b) requires plaintiffs to recite the "who, what, where, and when of the allegedly false or fraudulent representation"). Defendant appears to concede, however, that Plaintiff has met the requirement with regard to the alleged omission. The Court finds that Plaintiff's allegation that CEO Griffith was under a duty to disclose the Avis deal in the fall of 2012 but failed to do so has the requisite level of specificity under Rule 9(b). Defendant's Rule 9(b) challenge is therefore without merit.

disclose the merger discussions with Avis while it was negotiating Plaintiff's compensation. Zipcar counters that it was under no duty to disclose the potential acquisition.

Under Massachusetts law, the tort of fraud requires proof that "(1) the defendant made a misrepresentation of fact; (2) it was made with the intention to induce another to act upon it; (3) it was made with the knowledge of its untruth; (4) it was intended that it be acted upon, and that it was in fact acted upon; and (5) damages directly resulted therefrom." Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co., 798 N.E.2d 571, 574 (Mass. App. Ct. 2003).

In the absence of an affirmative misrepresentation, an action for fraud requires "both concealment of material information and a duty requiring disclosure." Sahin v. Sahin, 758 N.E.2d 132, 138 n.9 (Mass. 2001); Hinchey v. NYNEX Corp., 144 F.3d 134, 145 (1st Cir. 1998). Under Swinton v. Whitinsville Sav. Bank and its progeny, the "rule of nonliability for bare nondisclosure" is well-settled in Massachusetts. 42 N.E.2d 808, 809 (Mass. 1942) (finding the seller of a home not liable for fraud for failing to disclose a termite infestation the seller knew about when the transaction was made at arm's length). Defendants cannot be found liable for "concealment in the simple sense of mere failure to reveal, with nothing to show any peculiar duty to speak." Id. at 808.

Massachusetts courts generally rely on the Restatement (Second) of Torts § 551 to determine the circumstances giving rise to a duty to disclose. See, e.g., Nota Constr. Corp. v. Keyes Assocs., Inc., 694 N.E.2d 401, 404-05 (Mass. App. Ct. 1998) (denying summary judgment on plaintiff-subcontractor's claim that defendant-architectural firm had a duty to disclose subsurface ledge at elementary school construction site). One such circumstance is a fiduciary relationship between the parties. See, e.g. Urman v. S. Bos. Sav. Bank, 674 N.E.2d 1078, 1081 (Mass. 1997); Swinton, 42 N.E.2d at 808 (noting the absence of a "fiduciary relation between the parties" in finding no liability for nondisclosure). Employers, however, owe no fiduciary duty to employees. Estate of Moulton v. Puopolo, 5 N.E.3d 908, 921 (Mass. 2014).

Plaintiff's primary argument is that defendant is liable for a half-truth. In some circumstances, uttering a half-truth may be tantamount to a falsehood. Swinton, 42 N.E.2d at 808; see generally Restatement (Second) of Torts § 551(2)(b) (1977) (providing that a party is under a duty to disclose "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of facts from being misleading"). In Maxwell v. Ratcliffe, for example, the Supreme Judicial Court held that real estate brokers who represented that a cellar was dry were liable for misrepresentation, reasoning:

> Because the question of the dryness of the cellar had been raised expressly, there was special obligation on the brokers to avoid half truths and to make disclosure at least of any facts known to them or with respect to which they had been put on notice.

254 N.E.2d 250, 252 (Mass. 1969); see also Damon v. Sun Co., 87 F.3d 1467, 1479 (1st Cir. 1996) (when asked about environmental contamination of a gas station and surrounding property, seller was under a duty to avoid half-truths when the facts were susceptible to actual knowledge).

More on point, in Golber v. BayBank Valley Trust Co., the plaintiff-investor expressly asked the defendant-bank about the relationship between a bank official and a small business seeking capital, and the banker reassured the investor about the status of the company. When the plaintiff later learned that the company was in an undisclosed "workout" status at the bank, the court upheld a jury verdict that the bank's failure to disclose the company's financial troubles was a misleading half-truth, even though it was not the bank's practice to disclose that information. 704 N.E.2d 1191, 1194 (Mass. App. Ct. 1999) (negligent misrepresentation). Note that, in Golber, Damon, and Maxwell, the plaintiffs made an express inquiry about an issue or condition that was met with an incomplete or misleading response.

When a "seller knows of a weakness in the subject of [a] sale and does not notify the buyer of it," the non-disclosure

does not rise to the level of fraud. Greenery Rehab. Grp., Inc.
v. Antaramian, 628 N.E.2d 1291, 1294 (Mass. App. Ct. 1994); see
also Solomon v. Birger, 477 N.E.2d 137, 142 (Mass. App. Ct.
1985) ("There must be some affirmative act of concealment" to
bring an action for fraud). This holding is particularly
applicable where there is a negotiation and agreement between
"sophisticated businessmen" represented by counsel. Lily Transp.
Corp. v. Royal Instit. Servs., 832 N.E.2d 666, 685 (Mass. App.
Ct. 2005) (observing that the "restricted circumstances" giving
rise to tort liability for misrepresentation are not present
where both plaintiff-transportation company and defendant-
laundry service were "active and experienced" negotiators); see
also Rohm and Haas Elec. Materials, LLC v. Elec. Circuits
Supplies, Inc., 759 F. Supp. 2d 110, 121 (D. Mass. 2010)
(finding no liability for non-disclosure in negotiation between
plaintiff, a "large, sophisticated [electronics manufacturer]
with legal counsel" and defendant-distributor).

So the question is whether Plaintiff's insistence on the
inclusion of stock options in his executive compensation package
triggered a duty on Zipcar's part to disclose the fact that the
options might be worthless if the potential merger went through.
In Plaintiff's view, this omission is an actionable half-truth.
Defendant puts great weight on the fact that Plaintiff never
asked about a potential acquisition, that he was a sophisticated

11

businessman represented by counsel, that the negotiations were at arm's length and that he never asked about a potential merger, even though he was savvy enough to have asked another company with which he was interviewing about potential acquisitions.

Zipcar contends that the SEC rules governing merger negotiations, its internal Insider Trading Policy, Code of Business Conduct and Ethics, and the Confidentiality Agreement executed with Avis all precluded Zipcar from disclosing the information to Smith. It is unlikely that any of the policies would have prevented Zipcar from disclosing the truth with an appropriate nondisclosure agreement. If asked, another option was to say "no comment." However, here, Plaintiff never asked, and no misleading misstatement or half-truth about the preliminary merger discussions was made. As the Supreme Court has observed in a similar context, "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) (discussing the materiality standard in the context of preliminary merger discussions). See also Vladimir v. Bioenvision Inc., 605 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) (holding that a corporation has no specific duty to disclose merger negotiations under SEC rules until a merger agreement is signed).

12

Further, undisputed evidence reveals that the odds of the Avis deal going through were still unknown at the time of Smith's employment negotiations. Zipcar produced admissible evidence that Griffith thought the Avis deal was only 20 percent likely to go through, and there were other suitors, including two that penned formal letters of intent. In fact, Griffith thought the more likely scenario was an equity investment, which would have increased the value of the options. The undisputed facts are that the merger discussions were at the due diligence stage at the time the employment agreement was signed. Avis's firm offer to purchase Zipcar was not made until December 22, 2012, and even at this later stage, Zipcar was still engaged in parallel discussions with Investor A.

The Court concludes that no reasonable juror could find Zipcar's failure to disclose the merger negotiations is actionable under the <u>Swinton</u> line of cases. In light of the inchoate nature of the negotiations with Avis, plaintiff's sophistication and, most importantly, his failure to ask expressly about a potential acquisition, Defendant's motion for summary judgment as to Counts I and II of the Complaint is **<u>ALLOWED</u>**.[4]

---

[4] Defendant asserts the doctrine of ratification as a defense. <u>See generally</u> Restatement (Second) of Contracts § 7 (1981). When a contract is the product of duress or fraud, a party seeking to repudiate the agreement "must promptly complain of the

**B) Breach of Contract and the Covenant of Good Faith and Fair Dealing (Counts II and V)**

Plaintiff contends that Zipcar's decision to terminate him was made in bad faith, in violation of the covenant of good faith and fair dealing.

Massachusetts treats the duty to exercise good faith as an "implied term or condition" of every contract. Cadle Co. v. Vargas, 771 N.E.2d 179, 183 (Mass. App. Ct. 2002); Restatement (Second) of Contracts § 205 (1981). "Good faith and fair dealing is the understanding between the parties that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Tufankijan v. Rockland Trust Co., 782 N.E.2d 1, 5 (Mass. App. Ct. 2003) (citations omitted) (internal quotations omitted).

Smith argues that he had "Good Reason" to give a notice of termination because the pending Avis deal was poised to wipe out

---

circumstances" that make the contract voidable. In re Bos. Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989). Zipcar argues that by commencing work three weeks after he was informed of the potential deal, Plaintiff's conduct ratified the contract, and he therefore forfeits his fraud and misrepresentation claims. Plaintiff retorts that he only began work as planned because of CEO Griffith's assurances that Zipcar would craft an alternative LTIP, which Plaintiff argues was a negligent misrepresentation (Count VI of the Complaint). The Court need not resolve this defense as it finds there is no fraud or negligent misrepresentation.

the value of his options, and that he was planning to work for
the foreseeable future so that Zipcar could cure its failure to
provide him with the promised alternative LTIP. In his eyes, the
early termination was a deliberate effort to rob him of the
"fruits of the contract" - to wit, the more generous severance
triggered after a Change of Control. Med. Air Tech. Corp. v.
Marwan Inv., Inc., 303 F.3d 11, 23 (1st Cir. 2002) (quoting
Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir.
1936)) (internal citations omitted).

Zipcar responds that it had the prerogative to terminate
Smith, an at-will employee, at any time, with or without cause.
It argues that Smith was properly terminated before the Change
of Control, and that Zipcar did not have to wait for the 30-day
cure period to run its course. Zipcar further argues that the
opportunity to cure is an "employer's right, not its legal
obligation." Dkt. No. 116 at 13. While Zipcar did not have a
contractual obligation to wait 30 days to terminate Smith,
Zipcar was under a duty not to terminate him in bad faith. In
his e-mail triggering the cure period, Smith said that he
intended to continue working during the cure period. Zipcar
casts doubt on the sincerity of that statement, noting that the
day after Smith gave notice, he zipped over to Seattle, where
Corbis is based and where Smith lived before commencing work at

Zipcar. Discovery also revealed that Smith represented to Corbis that he was available to work starting March 1.

As the non-moving party, the Court must draw all reasonable inferences in Plaintiff's favor. On the record, there is sufficient evidence that he intended to continue working at least through the cure period and perhaps beyond, if the LTIP concerns were addressed to his liking. Whereas the Avis deal was still tenuous in December when the Employment Agreement was signed, by March 8, when Zipcar terminated Smith, the deal was less than a week from closing. Griffith did express some concern about "cultural mis-match" and Smith's "personal (stylistic) behaviors that may be signals of a lack of engagement," Exh. 37, but a reasonable juror could conclude that Zipcar breached the covenant of good faith and fair dealing by terminating him precipitously rather than giving him the LTIP Zipcar promised, or letting the Change of Control provisions kick in.[5]

With regard to Counts III (breach of contract -- failure to award severance) and V (breach of the covenant of good faith and fair dealing) of Plaintiff's Complaint, Defendant's motion for summary judgment is **DENIED**.

---

[5] Although Smith did not provide a written explanation of his resignation for Good Reason beyond the e-mails he exchanged with Griffith on March 5-6, 2013, the Court finds this breach immaterial.

**C) <u>Negligent Misrepresentation (Count VI)</u>**

Plaintiff argues that Zipcar promised to provide him with an alternative long-term incentive plan, which was a negligent misrepresentation. This issue was poorly briefed and was not argued at the hearing. Under Massachusetts law, a defendant is liable for negligent misrepresentation when (1) in the course of his business, (2) he supplies false information for the guidance of others (3) in their business transactions (4) causing and resulting in pecuniary loss to others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information. <u>DeWolfe v. Hingham Ctr., Ltd.</u>, 985 N.E.2d 1187, 1192 (Mass. 2013). A speaker is not liable simply because his predictions about future events do not pan out; the law merely requires that he "speak in good faith and without consciousness of a lack of any basis for belief in the truth or accuracy of what he says." <u>Fox v. F & J Gattozzi Corp.</u>, 672 N.E.2d 547, 588 (Mass. App. Ct. 1996) (quoting Restatement (Second) of Torts § 552(a) comment a (1997)).

With this standard in mind, I find that no reasonable juror could conclude that Zipcar is liable for negligent misrepresentation. There is no evidence that Griffith provided false information when he promised to provide an LTIP. There was

no promise as to the precise timetable. He has testified that he intended to provide Smith with an alternative LTIP, and indeed employees of a comparable rank ("senior team") as Smith were awarded incentive packages in April 2013, roughly a month after the Avis deal closed. Dkt. 117 at 73. Smith points out that it took longer than that for Zipcar to finalize the alternative pay for at least one employee, the Chief Marketing Officer. But there is no dispute that similarly situated executives were awarded new LTIPs.

Summary judgment is therefore **ALLOWED** as to Claim VI of the Complaint.

## D) Damages on Failure to Award Options (Count IV)

With respect to the breach of contract claim, defendant asserts that it is entitled to summary judgment on plaintiff's demand for damages based on an estimate of the value of his unvested Zipcar stock options, which Plaintiff puts at $1,575,000. Plaintiff asserts these damages for his fraud and misrepresentation claims, as well. In calculating this figure, he assumes that (a) he would have stayed at Zipcar for 6 years, allowing his 105,000 shares to fully vest; (b) he would be awarded a bonus 80,000 shares each of the six years; and (c) the

stock price of Zipcar would increase every year, ultimately
tripling in value.[6]

As a threshold matter, plaintiff never signed a stock
option agreement with Zipcar. The treatment of options in the
event of a separation is not comprehensively discussed within
the four corners of Plaintiff's Employment Agreement. Instead,
it makes reference to a "stock option agreement," which
Plaintiff and Zipcar never executed. Exh. 16. The employment
contract, however, does indicate that:

> The stock option agreement shall include a Change in Control
> (CIC) provision that will provide, upon the occurrence of
> certain circumstances and events as described therein,
> accelerated vesting of the remainder of the unvested shares
> in the event your employment is terminated under certain
> conditions within twelve (12) months of a CIC.

Exh. 14.

Even if the options contract had been properly executed and
Board approval granted, many courts have concluded that
assigning a value to unvested stock options is an exercise in
uncertainty. See Baccanti v. Morton, 752 N.E.2d 718, 726 (Mass.
2001) (in a divorce proceeding, observing that one of a

---

[6] In addition, Plaintiff seeks the value of his would-be stock
options in another company, Glympse, which made Smith a
competing offer of employment in the fall of 2012. Were it not
for Zipcar's allegedly fraudulent misrepresentations, Smith
asserts that he would have gone to work for Glympse, a
privately-held company. There is nothing in the record to
support a valuation for the Glympse stock. Moreover, the fraud
claims do not survive.

distinguishing characteristics of options is the "uncertainty of their value"); Fisher v. Fisher, 769 A.2d 1165, 1169 (Pa. 2001) (putting a dollar figure on unvested stock options is "impermissibly speculative" because "it is absolutely impossible to predict with reliability what any stock will be worth on any future date"); Kinsey v. Cendant Corp., 521 F. Supp. 2d 292, 308 (S.D.N.Y. 2007) (rejecting damages claim for stock options as "too speculative"); Ott v. Alger Mgmt. Inc., 2012 WL 4767200, at *8 (S.D.N.Y. Sept. 27, 2012) (stating that an at-will employee's breach of contract claim for unvested stock options is too speculative because it was unclear whether plaintiff would still be employed by defendant on the date the options vested). Plaintiff's reliance on Scully v. US WATS, Inc., 238 F.3d 497, 510 (3rd Cir. 2005), is misplaced because the options had vested, and the damages calculation was based on the value of options at the time of defendant's breach of contract.

Here, plaintiff cites no expert evidence to support his claim for damages based on the value of the unvested stock options. In light of the speculative nature of the requested damages, Defendant's motion for summary judgment is **ALLOWED** as to Count IV.

**E) ORDER**

20

The Court **ALLOWS** Zipcar's motion for summary judgment (Dkt. No. 94) on Claims I, II, IV, and VI, and **DENIES** the motion as to Claims III and V.

/s/ PATTI B. SARIS
Patti B. Saris
Chief Unites States District Judge